[794 NYS2d 171]

In the Matter of Scott Polmanteer, as Natural Father of Nicholas Polmanteer, an Infant, et al., Respondents-Appellants, v Deborah Bobo, as District Superintendent of Cato-Meridian Central School District, et al., Appellants-Respondents.

Fourth Department, April 29, 2005

**APPEARANCES OF COUNSEL**

*Matthew R. Fletcher*, Cayuga, for appellants-respondents.

*Andrew S. Fusco*, Auburn, for respondents-appellants.

*Jay Worona*, Latham, for New York State School Boards Association, Inc., and another, amici curiae.

*Douglas E. Gerhardt*, Albany, for New York State Council of School Superintendents, amicus curiae.

**OPINION OF THE COURT**

KEHOE, J.P.

In this CPLR article 78 proceeding, we are asked to interpret Education Law § 2023 (1), which provides in pertinent part:

> "*If the qualified voters* shall neglect or refuse to vote the sum estimated necessary for teachers' salaries, . . . or if they *shall neglect or refuse to vote the sum estimated necessary for ordinary contingent expenses, including the* purchase of library books and other instructional materials associated with a library and *expenses incurred for interschool athletics, field trips and other extracurricular activities* and the expenses for cafeteria or restaurant services, *the . . . board of education shall adopt a contingency budget including such expenses and shall levy a tax for the same*, in like manner as if the same had been voted by the qualified voters, subject to the limitations contained in subdivisions three and four of this section" (emphasis added).

Specifically, we are asked to decide whether Education Law § 2023 (1) requires a school district, as part of a contingency budget, to provide any particular level of funding, or indeed any funding at all, for such "ordinary contingent expenses" as "interschool athletics, field trips and other extracurricular activities." We conclude that it does not, and we thus conclude that the judgment should be modified accordingly, thereby dismissing the petition in its entirety. In all other respects, we conclude

that the judgment should be affirmed, summarily rejecting all other contentions raised on respondents' appeal and petitioners' cross appeal as either unpreserved for our review or lacking in merit.

I

On May 6, 2004, respondents, the Superintendent and Board of Education (Board) of the Cato-Meridian Central School District (District), considered the District's budget for the 2004-2005 academic year. In formulating a budget of $13,898,939 to be presented to the voters of the District, the Board cut its proposed expenditures by about $786,000 from the level projected in a preliminary budget document. That initial round of cuts eliminated 18 positions in the District, including the equivalent of 11.4 full-time teaching positions, as well as all funding for field trips, the cost of which would have been $21,865. Nonetheless, that proposed budget would have increased spending in the District by $1,099,633, or approximately 8.6%, over the 2003-2004 budget of $12,799,306, and it would have increased the property tax rate in the District by 12.68%. The proposed budget would have funded interscholastic sports and extracurricular activities at a combined level of approximately $350,000.

On May 18, 2004, the voters rejected the proposed $13.9 million budget. That same proposed budget was again put to the electorate, and again rejected, on June 15, 2004. Pursuant to section 2022 (4) and (5) and section 2023 (1) of the Education Law, when voters of a district twice disapprove a proposed budget, the district must adopt a "contingency budget" (§ 2023 [1]), also known as an "austerity" budget. The District did so on June 24, 2004, later amending that budget on July 21, 2004. As finally adopted, the contingency budget provided for spending of $13,401,321. The $497,618 pared from the voter-rejected budget in order to arrive at the contingency budget included about $350,000 in savings resulting from the elimination of all funding for interscholastic athletics and extracurricular activities. Nonetheless, the contingency budget increased the District's spending by more than $600,000, or about 4.7%, over the prior year's level. The overall increase in the budget, and the cuts necessitated in certain items thereof, were largely attributable to increases in the costs of employee fringe benefits, particularly health insurance premiums and retirement system contributions, and in the items of special education and debt

service. Some $250,000 of the increase in debt service was attributable to the District's decision to retire over three years a certain debt of about $720,000, the result of a decade's worth of apparently recently discovered operating deficits.

## II

Petitioners are taxpayers in the District who have children enrolled in the District's middle school or high school. Those children have participated or wish to participate in interscholastic athletics and other extracurricular activities, including field trips. On July 22, 2004, petitioners filed an administrative appeal with the New York State Commissioner of Education (Commissioner) pursuant to sections 310 and 2024 of the Education Law. That administrative appeal challenged, as a violation of Education Law § 2023, respondents' failure to fund interscholastic athletics, field trips, and other extracurricular activities in the contingency budget. In early August 2004, petitioners commenced this CPLR article 78 proceeding likewise challenging the legality of the contingency budget. In its first three causes of action, the verified petition alleged that it was unlawful under Education Law § 2023 (1) for the District to have eliminated, respectively, interschool athletics, field trips and other extracurricular activities. The fifth cause of action identified the $250,000 budgetary item for debt repayment as a pool of money out of which the District "should" fund the allegedly "illegally eliminated" programs; petitioners alleged that it was "unfair to the current students" for the District to retire that debt over three years when it had taken a decade to accumulate.

In their verified answer, respondents admitted that the contingency budget eliminated funding for interschool athletics and extracurricular activities, and that respondents had eliminated funding for field trips earlier in the budget process. Respondents nonetheless denied any illegality.

## III

In its decision, Supreme Court noted that the Board "made a conscious decision not to fund field trips in the two budgets it presented to the voters." The court thus determined that it was "a proper exercise" of the Board's discretion not to fund field trips in the contingency budget. However, the court concluded:

> "[R]espondents have abused their discretion in an arbitrary, capricious and illegal manner, in violation

of the plain meaning of [section 2023 (1)] of the Education Law, by totally eliminating any appropriation of monies for interschool athletics . . . and other extracurricular activities. This interpretation is made more compelling by the Legislature's substitution of the word 'shall' for 'may' made in the 1997 amendments to the section.

"In view of the Legislature's clear directive, zero funding of two of the areas in question (interschool athletics and extracurricular activities) is not an option."

The court recognized that the District's contingency budget was at its statutory cap under Education Law § 2023 and that respondents thus could not add funding for interschool athletics and extracurricular activities without either reducing other spending or violating the statutory cap. The court wrote that a "reasonable method" of affording petitioners appropriate relief was to compel respondents to fund interschool athletics and extracurricular activities "pro-rata based upon the amounts included for those items in the rejected budgets, as they relate to all other items in the overall reduction of approximately $400,000 [*sic*]." The court thus apparently intended that all such other spending, as so reduced, be in the same ratio to the original level of spending as the $13.4 million contingency budget bore to the $13.9 million voter-rejected budget. The court thus apparently mandated that, in order to offset any court-ordered increase in spending for interschool athletics and extracurricular activities, other components of the budget would be reduced across the board by an equal amount. According to the court, "In this manner it would appear that [there would be compliance with] the $13.4 million contingency budget [spending cap and] yet the statutory directions [to fund interschool athletics and extracurricular activities would be] observed" by respondents. The court "enjoined" respondents from implementing a contingency budget that made no provision for interscholastic athletics and extracurricular activities, and it directed respondents to adopt a new contingency budget allocating a "pro rata amount" to those activities "in compliance with the strictures contained in" Education Law § 2023 (3) and (4), unless respondents proposed an acceptable alternative remedy within four days.

Instead of proposing an alternative remedy, respondents submitted papers in which they set forth the legal and practical impossibility of implementing the court's directive. Respondents

noted that many of the District's budgeted expenses represented obligations imposed by law (including retirement system contributions and payments to the Cayuga-Onondaga Board of Cooperative Educational Services) or contract (including expenses for auditing and copying services and health care premiums), while others consisted of items of expense (e.g., for gasoline and utilities) over which the District had no practical control. Respondents therefore asserted that the District could not simply add funding for interschool athletics and extracurricular activities to its budget while reducing all other spending pro rata and thereby adhering to its statutory cap on overall contingency budget spending. Respondents further noted that, given the budget reductions already made by the District in "staffing and personnel costs," the District could not fund interschool athletics and extracurricular activities without imperiling its basic educational mission.

## IV

Subsequently, on December 24, 2004, the Commissioner issued a decision on petitioners' administrative appeal (*Appeal of Polmanteer*, 44 Ed Dept Rep — [Decision No. 15,155]). On the issue of the District's elimination of funding for interschool athletics, field trips, and other extracurricular activities, the Commissioner expressly deferred to Supreme Court (which had already ruled on the matter) and this Court (before which this appeal was already pending). The Commissioner thus declined to rule on that aspect of petitioners' challenge to the contingency budget, and he explicitly dismissed petitioners' appeal insofar as it raised that issue. Nonetheless, the Commissioner felt "compelled to comment on" the issue in view of its "statewide implications." (*Id.*) Thus, in dictum, the Commissioner "respectfully disagree[d]" (*id.*) with Supreme Court's conclusion that Education Law § 2023 (1) requires a board of education to include funding for such activities in a contingency budget. Citing the historical background of the statute and its 1997 and 2002 amendments, and relying heavily on his own 2000 decision in *Appeal of Baisch* (40 Ed Dept Rep 405 [Decision No. 14,512]), the Commissioner concluded that the purpose and effect of the 1997 amendments was merely to treat the costs of interscholastic athletics, field trips and other extracurricular activities as "ordinary contingent expenses" for which voter approval was no longer required (whereas historically it had been) prior to a school district's offering such programs as part of a contingency

budget. The Commissioner noted that a board of education had always possessed the discretion "to determine whether to include or exclude specific items of expense or activities in the district's educational program" and specifically to determine whether to incur "ordinary contingent expenses, including whether to purchase library books or instructional materials or to participate [in] interschool athletics or conduct field trips." (*Polmanteer*, 44 Ed Dept Rep at —). The Commissioner concluded that such historical discretion was not curtailed by the 1997 statutory amendment. Instead, the thrust of the amendment, the Commissioner noted, was to require a school district to implement a contingency budget in certain circumstances, while authorizing but not requiring the school district to fund interscholastic sports and other extracurricular activities, including field trips, as part of its contingency budget. The Commissioner concluded:

> "In sum, I find no indication in the language or legislative history of Education Law § 2023 (1) of an intent to compel boards of education to expend funds for programs or activities they have not approved. Accordingly, a board's decision not to fund interscholastic sports, extracurricular activities and field trips[ ] would appear to be within its authority and discretion" (*Polmanteer*, 44 Ed Dept Rep at —).

## V

On their appeal, respondents contend, inter alia, that the court misinterpreted Education Law § 2023 (1) in concluding that they are required, as part of the contingency budget, to fund interscholastic athletics and extracurricular activities. On their cross appeal, petitioners contend, inter alia, that the court erred in failing to direct respondents to fund field trips as part of the contingency budget.

## VI

The relevant provisions of Education Law § 2022 state:

> "4. In the event that the original proposed budget is not approved by the voters, the . . . board of education may adopt a final budget pursuant to subdivision five of this section or resubmit to the voters the original or a revised budget. . . . Notwithstanding any other provision of law to the contrary, the

school district budget for any school year, or any part of such budget or any propositions involving the expenditure of money for such school year[,] shall not be submitted for a vote of the qualified voters more than twice.

"5. If the qualified voters fail to approve the proposed school district budget upon resubmission or upon a determination not to resubmit for a second vote pursuant to subdivision four of this section, the . . . board of education, after applying thereto the public school moneys and other moneys received or to be received for that purpose, *shall levy a tax for the sum necessary for teachers' salaries and other ordinary contingent expenses* in accordance with the provisions of this subdivision and section [2023] of this article" (emphasis added).

The focus of this appeal is Education Law § 2023 (1), the pertinent provisions of which are quoted at the outset of this opinion. The statutory subdivisions referred to therein, Education Law § 2023 (3) and (4), generally restrict contingent budget expenditures by school districts by providing for an inflation- or cost-escalation-indexed but enrollment-adjusted cap on overall contingency budget spending, as well as a percentage cap on spending under the administrative component of the contingency budget.

## VII

We agree with respondents that the court erred in concluding that Education Law § 2023 (1) requires them to fund "interschool athletics, field trips and other extracurricular activities" as part of the contingency budget, and we reject the counterargument of petitioners that the court erred in failing to direct respondents to fund field trips as part of that budget. The interpretations of the statute advanced by petitioners and adopted by the court are at odds with the discretion historically accorded to a board of education in determining its district's budgetary priorities, as evidenced by the legislative history of the statute in question and by the construction consistently placed on that statute by the Commissioner in this and like matters.

At the outset, we note that our review of the statute and the history of the 1997 amendments leads us to reject respondents' contention that the word "shall" in Education Law § 2023 (1)

means "may" and not "must." The Legislature obviously meant "must," albeit only with reference to its directive that the board of education adopt a contingency budget and levy a tax for the same upon failing to obtain voter approval of a budget (*see* § 2023 [1]; *see also* § 2022 [4], [5]). Thus, this case logically cannot hinge on the "may"/"must" dichotomy inherent in the word "shall" (*see e.g. Munro v State of New York*, 223 NY 208, 213-214 [1918]; *State of New York v Town of Wallkill*, 170 AD2d 8, 10-12 [1991]; *see generally* McKinney's Cons Laws of NY, Book 1, Statutes § 171). Instead, the issue in this case is whether the District's clear statutory mandate to adopt a contingency budget in certain circumstances carries with it any concurrent obligation to fund every statutory category of "ordinary contingent expenses," at either the level proposed in the budget rejected by the voters (as urged by petitioners and the dissent) or at any other particular level of spending (as ordered by the court). We agree with respondents and the Commissioner that the statute cannot, consistent with either the statutory scheme or its pertinent legislative history, be read as imposing any such obligation.

Throughout its history, section 2023 (1) has been read to permit but not require a board of education to provide funding in its contingency budget for "ordinary contingent expenses," as that phrase has been statutorily defined or judicially or administratively construed from time to time. From its enactment in 1947 until 1992, the statute, originally codified as section 1718 of the Education Law, simply provided that, in the absence of voter approval of a budget, a board of education "may" levy taxes and thus expend monies for teachers' salaries and "ordinary contingent expenses," a concept that long remained undefined and unelaborated by statute (L 1947, ch 820, § 1, enacting Education Law art 35; *see* L 1953, ch 801, § 29; L 1954, ch 208, § 5). Historically, "ordinary contingent expenses" were deemed to be only those expenses that were authorized by statute, constituted a legal obligation of the district, or were necessary (self-evidently meaning "necessary" in the practical as opposed to the legal sense) to maintain the educational program, preserve property, or assure the health and safety of the students and staff (*see Appeal of Bean*, 34 Ed Dept Rep 437, 438 [Decision No. 13,373]; *Appeal of Seerup*, 33 Ed Dept Rep 585, 586-587 [Decision No. 13,158]; Formal Op of Counsel No. 213, 7 Ed Dept Rep 153, 154-158; *see also Brown v Board of Educ., Whitesboro Cent. School Dist.*, 110 Misc 2d 164,

166 [1981], *mod on other grounds* 88 AD2d 184 [1982]; *Matter of Reiss v Abramowitz*, 39 AD2d 916, 917 [1972]; *Matter of Education Alternatives v Mills*, 175 Misc 2d 105, 110 [1997]; 94 NY Jur 2d, Schools, Universities, and Colleges § 120). Thus, historically, the costs of interscholastic athletics, field trips, and other extracurricular activities (and likewise library purchases and cafeteria operations) were not regarded as categories of "ordinary contingent expenses." Accordingly, the statute historically was understood and enforced to forbid a district from incurring such expenses (apart from coaches' salaries) as part of a contingency budget, in the absence of specific voter approval (or, alternatively, absent the district's receipt in advance of donations earmarked for such expenditures) (*see Baisch*, 40 Ed Dept Rep at 408; *Appeal of Scarrone*, 35 Ed Dept Rep 443, 445 [Decision No. 13,594]; *Appeal of Farrell*, 30 Ed Dept Rep 81, 83-85 [Decision No. 12,397]; *Matter of Travers*, 21 Ed Dept Rep 643 [Decision No. 10,819]; *Matter of Board of Educ. of N. Syracuse Cent. School Dist.*, 21 Ed Dept Rep 221, 222 [Decision No. 10,659]; *Matter of O'Toole*, 18 Ed Dept Rep 7, 8 [Decision No. 9,715]; *Matter of Board of Educ. of Cleveland Hill Union Free School Dist.*, 16 Ed Dept 124, 126 [Decision No. 9,326]; *see also Appeal of Gallagher*, 39 Ed Dept Rep 623, 624 [Decision No. 14,331] [construing analogous provisions of Education Law § 2601-a (5)]).

The Legislature undertook to expand the definition of "ordinary contingent expenses" beginning with its 1992 amendment of section 2023 (1), which specified that the costs of "library books and other instructional materials associated with a library" were "ordinary contingent expenses" (L 1992, ch 775). Significantly, in a legislative memorandum in support of the 1992 amendment, its purpose was summarized as being "[t]o *allow* a school district operating on a contingency budget to purchase" library materials, in contrast to prior law, under which the purchase of such materials was "prohibited when a school budget has been defeated and the district is operating on a contingency budget" (Bill Jacket, L 1992, ch 775, at 5 [emphasis added]). Another legislative memorandum likewise noted that, under the bill, "Districts operating on a contingency budget would be *permitted* to purchase" library materials, in contrast to the existing prohibition on such purchases (*id.* at 6 [emphasis added]). Similar themes were expressed in various letters to the Governor's Counsel, including those of sponsoring Senator Farley, Assembly Member Tallon, Jr., sponsoring As-

sembly Member DiNapoli, and Assembly Member Magee (*id.* at 7-11). The bill was likewise described in various memoranda of the Division of the Budget, the New York State School Boards Association, the State Education Department, the Council of School Superintendents, the New York State United Teachers, the School Administrators Association of New York State, and the New York Library Association (*id.* at 13-15, 17-18, 20-22, 24-25, 27-29). Finally, in signing the amendment into law, then Governor Cuomo noted:

> "It is important that contingency budget expenditures be only those which are absolutely necessary [again, self-evidently meaning 'necessary' in the practical as opposed to the legal sense], because *allowing* additional and *discretionary expenses* effectively nullifies the decision of the voters, diluting an important control over school spending. . . .

> "Any expansion of *authorized contingency budget expenditures* causes an equal diminishment in the rights of the voters to limit spending, and for this reason we must tread carefully in making these decisions" (*id.* at 16 [emphasis added]).

In our view, the various writers' use of the italicized words and phrases is inimical to the interpretation placed on the statute by the court, which concluded that items of "ordinary contingent expenses" are mandated as part of a contingency budget.

In 1994, the Legislature amended section 2023 by creating a new subdivision (2). That statute requires that a district continue to fund its customary transportation of students to and from school in the event of voter disapproval of the budget, unless and until the voters, by special proposition, opt to limit such transportation expenditures (*see* L 1994, ch 489; Mem of Senator LaValle, 1994 NY Legis Ann, at 330). In our view, the Legislature's purpose in enacting a separate subdivision addressing the issue of student transportation was to distinguish such mandated (until voter-countermanded) expenditures from the discretionary "ordinary contingent expenses" specified in section 2023 (1).

In 1997, the Legislature again amended section 2023 (1) to include, as "ordinary contingent expenses," the expenses at issue in this appeal, namely, those "incurred for interschool athletics, field trips and other extracurricular activities" (L 1997, ch 436, part A, § 24). Otherwise, the statute was amended

by substituting the word "shall" for the word "may" with reference to the adoption by a district of a contingency budget (*id.*). The same amendment added section 2022 (4) and (5), which provide that a board of education may submit its proposed budget or other proposition for the expenditure of monies to the voters once or twice but "shall," after at most two electoral defeats, levy a tax to cover its contingency budget (L 1997, ch 436, part A, § 23). Finally, the Legislature at that time added Education Law § 2023 (3) and (4), thereby establishing caps on contingency budget spending overall and for administrative functions (L 1997, ch 436, part A, § 24).

Surprisingly for such an important bill, which encompassed major welfare reform in addition to school district budgetary matters, the recorded legislative history of the aforementioned 1997 amendments is minimal. Such history reveals only that the purpose of the amendments was to preclude a school district from submitting its budget to the voters more than twice, to make adoption of a contingency budget mandatory in the event of voter disapproval of the submitted budget, and to cap contingency budgets monetarily (*see* Mem of State Educ Dept, Bill Jacket, L 1997, ch 436, at 213-214). Nothing in the legislative history specifically addresses the purpose or effect of the amendment adding "interschool athletics, field trips and other extracurricular activities" to the list of "ordinary contingent expenses." Petitioners nonetheless regard the amendment, particularly its substitution of the word "shall" for the word "may," as effecting a major change in the law regarding "ordinary contingent expenses," specifically by eliminating a board of education's discretion with respect thereto. Respondents, in contrast, maintain that the amendment worked no change in the law in that regard. In our view, the absence of a clear statement of legislative purpose with regard to that aspect of the amendment belies petitioners' interpretation of the statute and buttresses respondents' position. Certainly, nothing in the legislative history indicates any intent to deprive a board of education of its historical discretion concerning whether and at what level to fund particular categories of ordinary contingent expenses as part of its contingency budget. We thus conclude that the legislative intent was merely to classify "expenses incurred for interschool athletics, field trips and other extracurricular activities" as among those "ordinary contingent expenses" that a district is authorized but not required to incur as part of its contingency budget, even absent specific voter approval for such items (*see generally Brown*, 110 Misc 2d at 167).

In 2000, in deciding *Baisch* (40 Ed Dept Rep 405), the Commissioner construed the 1997 amendments to the statute. There, after the district in question had adopted a contingency budget that eliminated some interschool sports, a group of disappointed parents asserted that section 2023 (1) required the district, as part of its contingency budget, to fund interschool athletics at a level equal to that set forth in the voter-defeated budget (*see id.* at 407-409). The Commissioner rejected that challenge, concluding:

> "The determination as to whether to conduct an interscholastic sports program lies within the authority and discretion of the board of education, as does the manner in which any such program is to be conducted. While such programs may be beneficial to students within a school district, a board of education is not legally obligated to offer an interscholastic sports program" (*id.* at 408, citing *Appeal of Tobin*, 25 Ed Dept Rep 301 [Decision No. 11,591] and *Appeal of DeMasi*, 18 Ed Dept Rep 320 [Decision No. 9,859]; *see Gallagher*, 39 Ed Dept Rep at 624 [construing analogous provisions of Education Law § 2601-a (5)]).

Education Law § 2023 (1) was most recently amended in 2002 (L 2002, ch 682, § 1). At that time, the Legislature added "the expenses for cafeteria or restaurant services" to the statute's list of "ordinary contingent expenses" (*id.*). With regard to whether such expenses are mandatory or discretionary as part of an adopted contingency budget, the legislative history accompanying the 2002 amendment is illuminating. According to a New York State Senate memorandum in support thereof, the amendment "*allows* school districts . . . the *ability to include* expenses for cafeteria or restaurant services[ ] as ordinary contingency expenses for which the . . . board of education *may* levy a tax" (Senate Mem in Support, 2002 McKinney's Session Laws of NY, at 2134 [emphasis added]). The supporting memorandum further provided that the purpose of the amendment was to "*allow* school districts the *ability to continue to provide* cafeteria services, as part of ordinary contingent expenses, should the voters fail to adopt the school board's proposed budget" (*id.* [emphasis added]; *see* Mem of Senator Kuhl, Jr., 2002 NY Legis Ann, 389, 390; *see also* Letter from Senator Kuhl, Jr. to Governor's Counsel, Bill Jacket, L 2002, ch 682, at 3). A number of other memoranda and form letters contained in the

Bill Jacket express a similar theme, stating, inter alia, that the bill "would simply *allow* a district the *flexibility* to fund school lunch and breakfast programs *if it chooses* as part of a 'contingency budget' " (*id.* at 10 [some emphasis added]) and would allow districts to "retain the *ability to decide how much funding* these programs would receive as part of" a contingency budget (*id.* at 13 [emphasis added]; *see id.* at 8-9, 14-25). Petitioners contend that the foregoing legislative history is of little moment, because it pertains only to the cafeteria expenses that were the subject of the 2002 amendment and not to any other statutory categories of expense. We reject that contention. A proper reading of the statute discloses that the specified categories of "ordinary contingent expenses" are on a par with one another. Thus, if any single category is discretionary and not mandatory, as contemplated by the Legislature at the time of the 1992 and 2002 amendments, then all of the categories necessarily are discretionary and not mandatory, including those set forth in the 1997 amendment. That fact undercuts the position of both Supreme Court and the dissent that it was permissible for the District to omit field trips, but not interschool athletics and extracurricular activities, from the contingency budget. That selective view of what expenses supposedly "shall" be included in a contingency budget is further undercut by the fact that, under the statute as written, "field trips," and possibly "interschool athletics" as well, are merely subcategories of "extracurricular activities."

Petitioners' interpretation of the statute as mandating the funding of certain enumerated "ordinary contingent expenses" as part of a contingency budget is at odds with the historically accepted definition of "ordinary contingent expenses." As previously indicated herein, that definition includes, in addition to those expenses that are a legal obligation of the district, those expenses that are authorized by statute or that are necessary, practically speaking, in order to maintain the educational program, preserve property, or assure the health and safety of the students and staff. Petitioners' interpretation of the statute and Supreme Court's determination are likewise inconsistent with the balance of the statutory scheme. To construe the statute as prohibiting a board of education from eliminating certain ordinary contingent expenses, particularly including such noncore items as interschool athletics, field trips and other extracurricular activities, would likely result in the imposition of irreconcilable statutory obligations upon a board of education, as

this case illustrates. The same statutory scheme that petitioners construe as requiring the funding of interscholastic athletics, field trips and extracurricular activities places school districts under the unambiguous obligation of adopting a contingency budget that (a) accomplishes the district's core educational mission, and (b) complies strictly with a statutory cap on overall contingency budget spending. Prohibiting the District in this case from eliminating interschool sports, field trips, and extracurricular activities, or mandating the reinstatement of such pared items of expense, would force the District either to compromise its basic educational mission or to violate its statutory cap on contingency budget spending. Further, while the Legislature's obvious overriding purpose in enacting the statutory scheme was to empower (in their respective spheres) both the voters in a district and the elected members of its board of education, petitioners' approach would nullify the will and actions of both the District's voters and the Board in this case. Most fundamentally, petitioners' approach would negate the historical discretion of a board of education to determine which, if any, "ordinary contingent" items to fund in its contingency budget, contrary to the Legislature's manifest purpose of expanding such discretion. Additionally, as the court implicitly recognized herein, and as the dissent acknowledges, there is no requirement that a board of education fund interscholastic athletics, field trips, and other extracurricular activities as part of a budget submitted to and eventually approved by the voters of a district. In that light, it would be anomalous to construe section 2023 (1) to require such funding as part of a contingency budget.

Finally, we note that the remedy proposed by the dissent does not comport, but instead logically collides, with its interpretation of the statute as mandating that the District fund, as part of its contingency budget, all categories of ordinary contingent expenses included as part of the budget rejected by the voters, and at the same level of expenditure proposed as part of that voter-rejected budget. Like Supreme Court, the dissent would remedy the perceived statutory violation by requiring the District to find the money with which to fund interschool athletics and other extracurricular activities by cutting other items, dollar for dollar, from the contingency budget adopted by the District, thereby keeping spending below the statutory cap on the District's overall contingency budget spending. However, at this stage of the budgeting process, there is no item that the

District could cut from its adopted contingency budget apart from "teachers' salaries" and "ordinary contingent expenses," the sole categories of expenses that may be included in the contingency budget in the first place. The conundrum lies in the fact that, according to the construction placed on the statute by Supreme Court and the dissent, such items of expense, once submitted to the voters, cannot be cut, either categorically or in terms of their level of funding, from the contingency budget.

Accordingly, we conclude that the judgment should be modified in accordance with this opinion, thereby dismissing the petition in its entirety.

GORSKI, J. (dissenting in part). I respectfully dissent in part. In my view, Supreme Court properly agreed with petitioners that Education Law § 2023 (1) requires respondents to fund "ordinary contingent expenses" as part of the contingency budget of the Cato-Meridian Central School District (District), and that the enumerated ordinary contingent expenses include expenses incurred for "interschool athletics, field trips and other extracurricular activities," as set forth in the statute.

As the majority notes, at various intervals the Legislature defined and then expanded its definition of the "ordinary contingent expenses" to which the statute refers. The majority further notes that, as originally enacted, such expenses included those items that a school district was required to fund by law, and those items that were "authorized by statute . . . or were necessary to maintain the educational program, preserve property, or assure the health and safety of the students and staff" (citations omitted). The amendment to section 2023 (1) at issue herein was enacted in 1997, and it specified that "ordinary contingent expenses" include those "incurred for interschool athletics, field trips and other extracurricular activities" (L 1997, ch 436, part A, § 24). At that time, the Legislature also amended the statute by substituting the word "shall" for the word "may" with reference to the adoption of a contingency budget (see id.). Thus, Education Law § 2023 (1) now provides:

"If the qualified voters shall neglect or refuse to vote the sum estimated necessary for teachers' salaries, after applying thereto the public school moneys, and other moneys received or to be received for that purpose, or if they shall neglect or refuse to vote the sum estimated necessary for ordinary

contingent expenses, including the purchase of library books and other instructional materials associated with a library and expenses incurred for interschool athletics, field trips and other extracurricular activities and the expenses for cafeteria or restaurant services, the sole trustee, board of trustees, or board of education *shall adopt a contingency budget including such expenses and shall levy a tax for the same*, in like manner as if the same had been voted by the qualified voters, subject to the limitations contained in subdivisions three and four of this section" (emphasis added).

I agree with petitioners that the 1997 addition of the word "shall" replacing the word "may" effected a major change in the law, requiring the Board of Education of the District to provide, within its discretion, the level of funding for each category of "ordinary contingent expenses" set forth in the statute. I take specific issue with the position of the majority that the word "shall" refers only to the directive that a board of education adopt a contingency budget and levy a tax in the event that voter approval of a budget is not obtained. In my view, the word "shall" applies equally to the inclusion of the enumerated expenses in the contingency budget. I also cannot agree with the statement of the majority that there is a " 'may'/'must' dichotomy inherent in the word 'shall' " (citations omitted). The word "shall" indicates that an act is mandatory, not permissive. Indeed, in discussing the addition of section 114-a (1) to the Workers' Compensation Law in 1996, the Court of Appeals noted that the imposition of the penalty referred to therein "is mandatory ('shall')" (*Matter of Losurdo v Asbestos Free*, 1 NY3d 258, 265 [2003]; *see also Matter of Pyramid Crossgates Co. v Board of Assessors of Town of Guilderland*, 302 AD2d 826, 828 [2003], *lv denied* 100 NY2d 504 [2003]; *Thomas v Alleyne*, 302 AD2d 36, 40 [2002]). In my view, the use of the word "shall" in the statute plainly and unambiguously requires the funding of all items of "ordinary contingent expenses" enumerated in the statute that were previously submitted to the voters and rejected. I acknowledge the view of the majority that such a statutory construction appears incongruous in light of the broad discretion historically afforded to a board of education, which is cast with the heavy responsibility of formulating a contingency budget. However, the 1997 amendment of the statute specifically added the word "shall" with linkage to the expanded scope

of the "ordinary contingent expenses" to be included in a contingency budget.

The majority sets forth the 1992 admonition of then Governor Cuomo that the expansion of the scope of ordinary expenses included in the contingency budget "effectively nullifies the decision of the voters." His statement buttresses my view that the Legislature was fully aware of the consequences of its actions when it added the disputed items to the enumerated ordinary contingent expenses and substituted the word "shall" for "may." Thus, in my view, we cannot defer to a historical analysis, and Education Law § 2023 (1) must be read as written. The Legislature, in its wisdom, substituted the word "shall" for "may" for reasons best known to it and in the future may well see fit to redefine ordinary contingent expenses. That, however, is properly the function of the Legislature, and it is not for a court to superimpose a statutory interpretation deemed desirable by the court. I note in addition that, in my view, to the extent that the majority appears to rely on the interpretation of this controversy expressed by the New York State Commissioner of Education (Commissioner), that reliance is misplaced. This matter involves statutory interpretation and pure issues of law and thus is within the province of the courts; it does not involve the "matters of policy" that are within the province of the Commissioner (*Matter of Walker v Board of Educ. of Olean City School Dist.*, 78 AD2d 982, 983 [1980]).

Unlike the majority, I do not find the absence of legislative history relative to the 1997 amendments to be meaningful particularly where, as here, the words adopted and enacted as part of Education Law § 2023 (1) are plain and unambiguous. I thus conclude that, despite the history of affording a board of education broad discretion with respect to school district funding, Education Law § 2023 (1) as amended in 1997 mandates the inclusion of funding of interschool athletics within the budgetary parameters of Education Law § 2023 (3) and (4), as plainly expressed in the statute. I note, however, that my construction of the statute applies only with respect to items included in the budget rejected by the voters. The inclusion of items such as field trips in the contingency budget is not required because, in the Board's discretion, field trips were not included in the budget rejected by the voters.

I further conclude, however, that the court erred in directing that the disputed items be included in the contingency budget on a "pro rata" basis. Accordingly, in my view, the judgment

should be modified by directing that respondents include the disputed funds previously deemed to be necessary in the budget rejected by the voters, subject to the limitations imposed by Education Law § 2023 (3) and (4).

I agree with the majority's conclusions with respect to the remaining issues before us.

MARTOCHE, SMITH and PINE, JJ., concur with KEHOE, J.P.; GORSKI, J., dissents in part in a separate opinion.

It is hereby ordered that the judgment so appealed from be and the same hereby is modified, on the law, by dismissing the petition in its entirety and as modified, the judgment is affirmed, without costs.